IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

_____ :
                                 :
EUGENE MOTES,                    :
                                 :
                Plaintiff,       :          3:16-cv-1309
                                 :
        v.                       :
                                 :          Hon. John E. Jones III
CAROLYN W. COLVIN, ACTING        :
COMMISSIONER OF SOCIAL           :
SECURITY                         :
                                 :
                Defendant.       :
_____ :

## MEMORANDUM

**April 11, 2017**

The above-captioned action is one seeking review of a decision of the

Acting Commissioner of Social Security ("Commissioner"),[1] denying Plaintiff

Eugene Motes' application for Social Security Disability Insurance Benefits

("DIB"), pursuant to 42 U.S.C. § 405(g).

Disability insurance benefits are paid to an individual if that individual is

disabled and "insured," that is, the individual has worked long enough and paid

social security taxes.  Motes met the insured status requirements of the Social

_____

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security.  Pursuant to Federal Rule of Civil Procedure 25(d), Nancy A. Berryhill is substituted for Carolyn W. Colvin, Acting Commissioner of Social Security as the defendant in this suit.

Security Act through December 31, 2013.  (Tr. 15).[2]

Motes filed his application for DIB under Title II of the Social Security Act

("Act"), on October 10, 2012, alleging disability beginning April 8, 2012.  (Tr. 13).

Motes had been diagnosed with several impairments, including left shoulder pain,

sleep apnea, diabetes mellitus, obesity, ADHD, schizophrenia, bipolar disorder,

depression, and anxiety.  (Tr. 15).  On June 13, 2013, Motes' application was

initially denied by the Bureau of Disability Determination.  (Tr. 13 and 78).

A hearing before the Administrative Law Judge ("ALJ") Office of Disability

and Adjudication and Review of the Social Security Administration was conducted

on November 6, 2014.  (Tr. 31-77).  At the hearing, Motes was represented by

counsel, and a Vocational Expert testified.  (Id.).  On January 30, 2015, the ALJ

issued a decision denying Motes' application.  (Tr. 13-25).  On May 17, 2016, the

Appeals Council declined to grant review.  (Tr. 1-6).  Thus, the ALJ's decision

stood as the final decision of the Commissioner.

Motes filed a complaint before this Court on June 24, 2016.  (Doc. 1).

Motes also filed an application to proceed in forma pauperis (Doc. 2), which the

Court granted.  (Doc. 3).  After supporting and opposing briefs were submitted

---

[2] References to "Tr. __" are to pages of the administrative record filed by the Defendant
as part of the Answer (Docs. 7 and 8) on September 6, 2016.

(Docs. 10, 12, 13), the appeal[3] became ripe for disposition.

Motes appeals the ALJ's determination on four grounds: (1) substantial evidence does not support the ALJ's step three evaluation; (2) substantial evidence does not support the ALJ's RFC assessment; (3) the ALJ failed to properly weigh the opinion evidence; and (4) the ALJ improperly discounted Motes' credibility. For the reasons set forth below, the decision of the Commissioner will be affirmed.

## I.     FACTS

Motes was forty-four years of age on the date last insured; has a high school education and is able to communicate in English; and has past relevant work experience as a warehouse laborer.  (Tr. 23, 24).

### A.     Motes' Impairments

In the late hours of February 24, 2012, Motes presented to the Holy Spirit Hospital Behavioral Health Center with complaints of anxiety due to nightmares and visions of past childhood abuse, including physical abuse by his parents.  (Tr. 281).  He described having nightmares of killing his family and thoughts of walking in front of the train.  (Id.).  Motes also complained of declined sleep and appetite, weight loss, negative self-talk and thoughts.  (Id.).  It was noted that

---

[3] Under the Local Rules of Court, "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."  M.D. Pa. Local Rule 83.40.1.

Motes had stopped taking his prescribed Prozac and Concerta. (Id.). Motes was discharged on February 25, 2012 with a diagnosis of depression, suicidal ideation, hyperglycemia, and uncontrolled diabetes mellitus. (Tr. 285).

On April 3, 2012, Motes underwent a psychiatric evaluation with Sylvestre De La Cruz, M.D. (Tr. 339). Motes related to Dr. De La Cruz that he has been feeling depressed in mood associated with anhedonia, insomnia, and a decrease in appetite. (Tr. 339). On mental examination, Dr. De La Cruz found Motes' concentration to be fairly good, he had good attention and focus, denied any suicidal or homicidal thoughts, and also denied any delusions or hallucinations of any type. (Tr. 341). Dr. De La Cruz did not see any conclusive evidence of ADHD but noted that Motes has a history of having been physically and emotionally abused by both of his parents and from that, is experiencing nightmares and flashbacks of the abuse. (Id.). Motes was diagnosed with bipolar disorder and PTSD. (Id.). Motes stated that he preferred Depakote and Prozac, which he was prescribed, and was referred for individual counseling for PTSD. (Tr. 342).

On April 16, 2012, Motes presented to Pinnacle Health's Kline Health Center for evaluation of his diabetes. (Tr. 304). V. Gorrepati, MD, noted that Motes is 5'9" tall, weighed 220.6 pounds and had a BMI of 32.11. (Tr. 305). Dr.

Gorrepati's assessment/plan notes diabetes mellitus, type 2; obstructive sleep apnea, stable; narcolepsy, no signs since nine years and not on medication; bipolar 1 disorder, stable and on medication; and depression, stable and on medication. (Tr. 306).

Motes returned to the Kline Health Center on September 17, 2012 for a follow-up of his diabetes. (Tr. 301). Motes stated that he had run out of Novalog and his blood glucose was in the low 300s. (Id.). On psychiatric evaluation, his symptoms included anxiety, depression, and insomnia. (Tr. 302). Motes was given samples of Lantus and Humalog and an appointment was set up with a social worker about assistance with medications. (Tr. 303).

On December 10, 2012, Motes presented to the Pinnacle Health emergency room with complaints of high blood sugar, stating that he was out of Novalog for the past three weeks. (Tr. 349). Motes was diagnosed with hyperglycemia, uncontrolled diabetes, and medication noncompliance. (Tr. 354). He was further advised to stay on his insulin. (Id.).

On March 26, 2013, Christine Daecher, D.O., performed a consultative examination. (Tr. 405-12). Dr. Daecher noted Motes' weight was 226 pounds and that he had a BMI of 34.16. (Tr. 409). Dr. Daecher further observed that sensation diminished in Motes's early left foot, had some degree of diabetic neuropothy in

his feet, and that he exhibited anxious mood and blunted affect. (Tr. 411). With regard to his complaints of left shoulder pain, Dr. Daecher noted pain with flexion and abduction, only occurring with shoulder shrugging type movements or shoulder rolling. (Tr. 408, 410). Dr. Daecher diagnosed diabetes mellitus type II, uncontrolled; joint pain (shoulder), and generalized anxiety (although, Dr. Daecher notes that she did not fully evaluate Motes for his mental health conditions). (Tr. 411-12).

On May 28, 2013, Stanley E. Schneider, Ed.D., performed a psychological consultative examination. (Tr. 419). During examination, Dr. Schneider observed Motes as being highly anxious, nervous, and apprehensive. (Tr. 421). Dr. Schneider notes his mood reflects both anxiety and underlying depression; his affect was anxious; and that he is agoraphobic. (Tr. 425). Motes reported to Dr. Schneider that he experiences both auditory and visual hallucinations, and admitted to recurrent suicidal ideation, but denied any plan or intent, and any homicidal thinking. (Id.). Dr. Schneider also noted that Motes has memory deficits on a short-term nature, and that his attention and concentration are significantly impaired. (Id.). Dr. Schneider diagnosed posttraumatic stress disorder, panic disorder with agoraphobia, bipolar disorder, and ADHD. (Tr. 426).

On June 11, 2013, Louis Poloni, Ph.D., a state agency psychologist,

reviewed Motes' claim for benefits and opined that, despite a moderate restriction in activities of daily living, maintaining social functioning, and concentration, persistence, or pace, Motes had the mental residual functional capacity to perform simple, unskilled work in an isolated setting. (Tr. 85, 90). Motes presented again to the Pinnacle Health emergency room on September 1, 2013. (Tr. 445). His complaints included high glucose, headaches, arm and leg tingling, and increased thirst and urination. (Tr. 445, 447). He stated that he did not have test strips for three months. (Tr. 445). Motes was diagnosed with dehydration and mild hyperglycemia. (Id.). Psychiatric examination revealed normal affect, judgment and insight, normal memory, and normal concentration. (Tr. 447). Discharge instructions provide that Motes continue to do the great job in keeping his glucose controlled in spite of not having test strips, and stay well hydrated. (Tr. 451).

On follow up from his emergency room visit, Motes presented to Pinnacle Health's Kline Health Center on September 3, 2013, where he was seen by Allyson Miller, a nurse practitioner. (Tr. 487). Ms. Miller's notes indicate that Motes was looking to obtain glucose strips and that he is not currently taking insulin due to not having insulin strips. (Id.). Motes denied any complaints other than feeling tired more than normal. (Id.). On evaluation, Motes' mood and affect were

appropriate and he was oriented to time, place, person, and situation. (Tr. 489). Ms. Miller's assessment/plan included diabetes type 2 with renal changes, uncontrolled; microproteinuria; diabetes type 2 with neurologic changes, refer to podiatry in regards to tingling in feet; unspecified type schizophrenia; and hypertension. (Tr. 489).

A week later, on September 11, 2013, Motes had a follow-up appointment with Ms. Miller. (Tr. 484). Motes stated he was feeling much better, and about to do more exercise and has less fatigue. (Tr. 484). Motes continued treatment with Ms. Miller through April 10, 2014. (Tr. 465). Ms. Miller's December 9, 2013 notes indicate that Motes' physical therapy for his shoulder is going fantastic, his psych issues are stable with no recent changes in his medications, and her assessment/plan included diabetes mellitus type II uncontrolled; left shoulder pain; sleep apnea; bipolar 1 disorder; and schizophrenia. (Tr. 455, 458). Ms. Miller's March 3, 2014 notes indicate that Motes received podiatry shoes and that his BiPap machine was working and Motes sleeps with no apnea. (Tr. 460). On physical examination, he had a normal range of motion, muscle strength, and stability in all extremities with no pain on inspection. (Tr. 463). On April 10, 2014, Motes saw Ms. Miller for his one month follow up for his diabetes. (Tr. 465). Ms. Miller notes that Motes is working out, weight lifting, eating much better, and that he

reports that his clothes are fitting better.  (Id.).

**B.     Residual Functional Capacity Assessments**

On March 26, 2013, Dr. Daecher, completed a physical residual functional capacity assessment after conducting a consultative examination of Mr. Motes. (Tr. 413).  Dr. Daecher opined that Motes was capable of frequently lifting and carrying 20 pounds and occasionally lifting and carrying 100 pounds, but could only occasionally lift above chest height; had no limitations in standing, walking, sitting, pushing and pulling; could frequently bend, kneel, stoop, crouch, balance, and climb; and could occasionally reach.  (Tr. 413, 414).

Dr. Schneider completed a mental medical source statement of Motes' ability to do work-related activities on May 28, 2013.  (Tr. 428).  Dr. Schneider opined that Motes had extreme limitations in most mental work-related areas, except in the area of carrying out simple instructions, wherein Dr. Schneider opined that Motes had marked limitations.  (Id.).

Dr. Poloni, a state agency psychologist, reviewed Motes' claim for benefits on June 11, 2013, and opined that Motes had moderate restrictions in activities of daily living, maintaining social functioning, and concentration, persistence, or pace.  (Tr. 85, 90).  Despite these moderate limitations, Dr. Poloni opined that Motes had the mental residual functional capacity to perform simple, unskilled

work in an isolated setting.  (Id.).  Dr. Poloni further opined that Dr. Schneider's opinion should be accorded little weight because his extreme findings were inconsistent with the medical evidence.  (Tr. 90).

Ms. Miller also completed a physical residual functional capacity assessment, as well as a diabetes mellitus residual functional capacity assessment. (Tr. 438, 493).  Ms Miller opined that Motes could frequently lift and carry less than 10 pounds; sit for less than 2 hours, and stand and/or walk for 6 hours in an 8-hour day.  (Tr. 440, 494).  She provided that he could occasionally perform postural activities; he should avoid all exposure to extreme heat, humidity, wetness, and pulmonary irritants; that he was limited in the use of his hands and fingers; and that he could not reach overhead.  (Tr. 440-41, 495-96).  Ms. Miller further opined that Motes needed to change positions at will; needed to take unscheduled breaks; that he constantly experienced pain or other symptoms severe enough to interfere with attention and concentration; and that he was incapable of even low stress jobs and would likely be absent from work more than four days per month.  (Tr. 439-41, 493-96).

## C.    The Administrative Hearing

On November 6, 2014, Motes' administrative hearing was conducted.  (Tr. 31-77).  At that hearing, Motes testified that he had fluctuating blood sugar levels,

but that they were getting better with an improved diet. (Tr. 51). Additionally, his orthotic shoes helped him to walk better. (Tr. 56). Motes also testified that he had anxiety and rarely left the home alone; he sometimes had irritability and would stay in his bedroom for hours; had difficulty being around others; and had difficulty finishing things he started, such as chores. (Tr. 57, 58, 61-63). He further testified that he took naps two to three times per week for approximately two hours. (Tr. 58-59). Motes also stated that his medications caused drowsiness and nausea, but that he drinks milk to cope with the nausea. (Tr. 54, 55).

Motes further testified that he did graphic designs on the computer for t-shirts and sweatshirts. (Tr. 44-46). He would spend four or five hours a day on the computer, twice a week; however, he testified that he has not used the computer in about a month. (Tr. 46). Motes testified that he goes to the gym, but sometimes loses the desire to stay once he gets there. (Tr. 60). Motes also testified that about two to three weeks before the ALJ hearing, he and his family went to Hershey Park, located about thirty-five miles from his house. (Tr. 46). He stated that he had fun, and that he did pretty well with the crowds. (Tr. 46, 48).

After Motes testified, Daniel Elman, an impartial vocational expert, was called to give testimony. (Tr. 71). The ALJ asked Mr. Elman to assume a hypothetical individual with Motes' age, education, and work history, who was

limited to light work, but could only occasionally climb ramps and stairs, but never

ladders, ropes, and scaffolds, and could frequently balance, stoop, kneel, crouch,

and crawl. (Tr. 72). Furthermore, the hypothetical individual could not be a

commercial driver, and must avoid all exposure to hazards, such as inherently

dangerous moving machinery and unprotected heights. (Tr. 72, 73). Additionally,

the hypothetical individual would be limited to routine, repetitive tasks, with the

SVP 1 to 2 level, must work in a static, low stress environment with infrequent

changes, and changes that did occur would be explained and demonstrated and

could be learned in 30 days or less. (Tr. 73). Finally, the work could not be fast

paced or ask for production time quotas, and there could only be occasional

interaction with the general public. (Id.).

Mr. Elman opined that, given these restrictions, the hypothetical individual

would be unable to perform Motes' past relevant work. (Id.). However, the

individual would be capable of performing three jobs that exist in significant

numbers in the national economy: a housekeeping cleaner, a photocopy machine

operator, and a folding machine operator. (Id.). Mr. Elman testified that, if an

individual were limited to incidental or no contact with the general public, and only

occasional, superficial interaction with coworkers and supervisors, that there would

only be a reduction from 18,000 to 9,000 nationally in the photocopy machine

operator job. (Tr. 73, 74). Finally, Mr. Elman opined that if an individual was further limited to occasional reaching with the left upper extremity, that neither the folding machine operator nor the photocopy machine operator would change, but the housekeeping cleaner would have to be removed. (Tr. 74).

## II.  DISCUSSION

In an action under 42 U.S.C. § 405(g) to review the Commissioner's decision denying a plaintiff's claim for disability benefits, the district court must uphold the findings of the Commissioner so long as those findings are supported by substantial evidence. Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Pierce v. Underwood,* 487 U.S. 552, 656, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) (quoting *Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). In an adequately developed record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed.*

*Mar. Comm'n,* 383 U.S. 607, 620, 86 S.Ct. 1018, 16 L.Ed. 2d 131 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," *Cotter v. Harris,* 642 F.2d 700, 706 (3d Cir. 1981), and "must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp.v. N.L.R.B.*, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 203 (3d Cir. 2008). Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. *Smith v. Califano,* 637 F.2d 968, 970 (3d Cir. 1981).

The plaintiff must establish that there is some "medically determinable basis for an impairment that prevents him from engaging in any substantial gainful activity for a statutory twelve-month period." *Fargnoli v. Massanari*, 247 F.3d 34, 38-39 (3d Cir. 2001) (quoting *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999)) (internal quotations omitted). "A claimant is considered unable to engage in any substantial gainful activity 'only if his physical or mental impairment or

impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .'" Fargnoli, 247 F.3d at 39 (quoting 42 U.S.C. § 423(d)(2)(A)).  The Commissioner follows a five-step inquiry pursuant to 20 C.F.R. § 404.1520 to determine whether the claimant is disabled.  In Plummer, the Third Circuit Court of Appeals set out the five-steps:

> In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity.  20 C.F.R. § [404.]1520(a).  If a claimant is found to be engaged in substantial activity, the disability claim will be denied. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987) . . . .  In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment.  20 C.F.R. § 404.1520(c).  If the claimant fails to show that her impairments are "severe," she is ineligible for disability benefits.

> In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work.  20 C.F.R. § 404.1520(d).  If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five.  Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work.  20 C.F.R. § 404.1520(d).  The claimant bears the burden of demonstrating an inability to return to her past relevant work. *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994).

> If the claimant is unable to resume her former occupation, the evaluation moves to the final step. At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. 20 C.F.R. § 404.1520(f).  The ALJ must show there are other jobs

existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled. *See* 20 C.F.R. § 404.1523. The ALJ will often seek the assistance of a vocational expert at this fifth step. *See,* [sic] *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984).

*Plummer*, 186 F.3d at 428.

## A.    Weight Accorded to Medical Opinions

Motes argues that the ALJ erred in according little weight to Ms. Miller's opinion - Motes' treating nurse practitioner, little weight to the psychological consultative examination doctor's opinion, Dr. Schneider, and finally, no weight to the state agency SDM's opinion.

Medical opinions are "statements from *acceptable medical sources* that reflect judgments about the nature and severity of [a claimant's] impairment(s), including ... symptoms, diagnosis and prognosis, what [a claimant] can still do despite impairment(s), and [a claimants] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2) (emphasis added). Only licensed physicians (medical or osteopathic doctors), licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists are considered "acceptable medical sources." 20 C.F.R. § 404.1502(a); see 20 C.F.R. § 404.1513(a). Evidence from "other sources" that are not "acceptable medical

sources" ... are *not entitled controlling weight*.  See 20 C.F.R. § 404.1513(a);

Social Security Ruling (SSR) 96–2p (rule for according controlling weight to

"treating source medical opinions"); SSR 06–03p; *Hartranft v. Apfel*, 191 F.3d

358, 361 (3d Cir. 1999; *cf. Gomez v. Chater*, 74 F.3d 967, 970-71 (9th Cir. 1996)

(Opinions from "other sources" can be accorded "less weight than opinions from

acceptable medical sources").

　　Any medical opinion from an acceptable medical source, unless it is

designated a controlling treating medical opinion, must be analyzed according to

factors set forth in the Code of Federal Regulations.  20 C.F.R. § 404.1527(c).

These factors include: the examining relationship, the length of the treatment

relationship and frequency of visits, nature and extent of the treatment relationship,

whether the medical source supports the opinion with medical evidence, whether

the opinion is consistent with the record as a whole, the medical source's

specialization, and other factors that tend to support or contradict an opinion.  *Id.*

　　Motes' first argument is that the ALJ erred in according limited weight to

treating nurse practitioner, Ms. Miller's opinion.  The record reflects that Ms.

Miller is a nurse practitioner who treated Motes a total of six times, beginning on

September 13, 2013.  As set forth above, only licensed physicians (medical or

osteopathic doctors), licensed and certified psychologists, licenses optometrists,

licensed podiatrists, and qualified speech-language pathologists are considered acceptable medical sources. 20 C.F.R. § 404.1502(a). A nurse practitioner is not an acceptable medical source under the regulations; therefore, a nurse practitioner's opinion cannot be given controlling weight. However, an ALJ may consider a non-acceptable medical opinion to assess severity of impairments and functional effect, and my reject or accept the opinion after explaining the reasons for doing so. SSR 06-03p; *Burnett v. Comm'r of Soc. Sec. Admin*, 220 F.3d 112, 122 (3d Cir. 2000) (explaining that an ALJ must consider all non-medical evidence and explain why it rejects or accepts such testimony).

Motes argues that the ALJ failed to explicitly address the checklist factors in considering Ms. Miller's opinion and incorrectly found Ms. Miller's opinion to be inconsistent with objective evidence in the record. To support his objection, Motes points to consistencies between the RFC questionnaire completed by Ms. Miller and Ms. Miller's own previous treatment notes. However, Motes fails to address the contradictory and inconsistent evidence found throughout the medical records for this case.

For example, the ALJ noted that physical examinations documented normal range of motion of Motes' upper and lower extremities, normal motor strength of the upper and lower extremities, normal sensation, normal fine motor movements,

and normal gait and station. (Tr. 353, 446-47, 463, 481, 489). The ALJ further noted that recent treatment records indicate that Motes had been working out and weight lifting. (Tr. 465). As for Motes' mental status, the ALJ notes that examinations documented normal memory and concentration. (Tr. 341, 447). Finally, the ALJ adequately addressed that Ms. Miller is Motes' treating nurse practitioner, cited her medical notes throughout the decision, and discussed the inconsistencies of her opinion with the other medical evidence of record. Thus, the ALJ adequately explained his allocation of weight to Ms. Miller's opinion, and the record supports this determination.

Motes next argues that the ALJ erred in assigning little weight to the consultative examiner, Dr. Schneider, while assigning significant weight to the state agency psychological consultant, Dr. Poloni. Motes argues that Dr. Schneider's opinion "trumps" Dr. Poloni's, since Dr. Schneider examined Motes. However, a non-treating, non-examining medical opinion must be analyzed according to the factors set forth above to determine its weight, and may ultimately be entitled to more than little, if any, weight. In fact, a non-treating, non-examining medical opinion may be allocated greater weight than other acceptable and non-acceptable medical sources, provided the ALJ gives adequate explanation for its determination. SSR 96-6p; 20 C.F.R. § 04.1527(c); *Morales v. Apfel*, 225

F.3d 310, 317 (3d Cir. 2000); *Hartranft v. Apfel*, 181 F.3d 358, 361 (3d Cir. 1999).

In the case at hand, the ALJ explained why he afforded Dr. Schneider's opinion little weight and Dr. Poloni's opinion significant weight:

> [Dr. Schneider] found that the claimant had marked limitation in his ability to carry out simple instructions and extreme limitation in his ability to understand and remember simple instructions, to make simple work related decisions, and to interact appropriately with the public (Exhibit B7F). This opinion was given limited weight because it is based upon an isolated examination and it appears to rely heavily on the subjective report of symptoms and limitations provided by the claimant. In addition, the totality of the evidence does not support the opinion. Mental status examinations generally documented calm motor behavior, appropriate affect, coherent thought processes, normal thought content, intact memory, and normal concentration (see, Exhibits B3F, B10F, B13F, and B14F). Further, the claimant is able to maintain personal needs and grooming, take care of pets, prepare simple meals, complete household chores, attend appointments, shop in stores, go to the gym, take vacations, feed those in need, use the computer, read daily, and watch television ....

> [Dr. Poloni, however] determined that the claimant had moderate limitations in the areas of understanding and memory, sustained concentration and persistence, social interaction, and adaptation, but was able to perform simple unskilled work in an isolated setting (Exhibit B2A). He found that the claimant could understand and follow simple instructions, behave appropriately, avoid hazards, and make independent decision (Exhibit B2A). [Significant] weight [was given] to [this] opinion of [Dr. Poloni], who is well qualified by reason of training and experience in reviewing an objective record and formulating an opinion as to limitations. [Dr. Poloni] is deemed to possess specific

understanding of our disability programs and their evidentiary requirements. Further, his assessment is consistent with and supported by the medical and other substantial evidence.

(Tr. 22, 23).

The ALJ further articulated that while at times, mental status examinations documented depressed, anxious, or irritable mood, blunted affect, minimal eye contact, nervous behavior, and pressured speech (Exhibits B3F/1; B6F/7; B7F3, 6-7; B13F/7), mental status examinations also documented normal mood and affect, normal appearance/good hygiene, good eye contact, calm motor behavior, normal speech, coherent thought processes, normal thought content, normal orientation, normal immediate, recent, and remote memory, normal concentration, good attention and focus, good arithmetical skills, and normal judgment and insight (Exhibits B2F/2, 6; B3F/1-6; B4F/3, 6; B6F/6-7; B7F/8; B10F/5; B12F/3-4, 9, 12; B13F/1-8; B14F/5, 9, 13). (Tr. 20).

This explanation includes consideration of numerous factors, as required by section 404.1527(c) of the regulations, namely the specialty of the doctors, the objective medical evidentiary support, consistency with other evidence at the hearing, and other factors. Thus, the ALJ's decision to place significant weight on Dr. Poloni's opinion and little weight on Dr. Schneider's opinion is proper.

Motes also argues that the ALJ "clearly" failed to evaluate the opinion of the

single decision maker ("SDM"), Shanna Smith. This argument has no merit. The ALJ assigned no weight to the opinion of the SDM Shanna Smith in assessing Motes' RFC. SDM's are non-physician disability examiners who "may make the initial disability determination in most cases without requiring the signature of a medical consultant." *Social Security Administration, Notices*: 71 FR 45890-01, 2006 WL 2283653.

On May 19, 2010, Frank Cristaudo, the Chief Administrative Law Judge for the Social Security Administration, issued a memorandum citing POMS Instruction DI 24510.050C[4] and instructing all ALJs that RFC determinations by SDM's should not be afforded any evidentiary weight at the administrative hearing level. Therefore, any assignment of any evidentiary weight to an SDM's opinion is an error since they are "not a medical professional of any stripe, and a finding from such an individual is entitled to no weight as a medical opinion, or to consideration as evidence from other non-medical sources." *Bolton v. Astrue*, Civ. No. 07-612, 2008 WL 2038513, at *4 (M.D. Fla. May 12, 2008) (internal citations omitted); *see Yorkus v. Astrue*, Civ. No. 10-2197, 2011 WL 7400189 (E.D. Pa. Feb. 28, 2011).

Here, Ms. Smith is not a medical professional of any stripe, and accordingly,

---

[4] The "POMS" is the Social Security Administration's "Program Operations Manual System," an internal manual used by Social Security employees to process disability claims.

the ALJ properly accorded no weight to this assessment.

**B.** **ALJ's Residual Functional Capacity (RFC) Assessment**

Motes' next argument is lodged against the ALJ's RFC assessment alleging

that it does not account for his difficulty with concentration, persistence, or pace.

An RFC assessment is defined as the most a claimant can do in a work setting

despite the physical and mental imitations resulting from all of his impairments. 20

C.F.R. § 404.1545(a)(1).  The Commissioner must use all relevant evidence in the

record to make the RFC assessment.  Id.  For a step-five decision to be supported

by substantial evidence, all of a claimant's credibility established limitations must

be included in an ALJ's RFC assessment and accurately conveyed to a vocational

expert.  See *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005); SSR 96-8p.

In his RFC assessment, the ALJ accounted for Motes' limitations in

concentration, persistence, or pace by limiting Motes to "routine and repetitive

tasks ..."; working in a "static low stress environment with infrequent changes and

changes that did occur would be explained and/or demonstrated and could be

learned in 30 days or less"; "could not ... perform[] jobs that are fast paced or have

strict production or time quotas"; and "limited to incidental or no contact with the

general public and only occasional, superficial (i.e., work in the same area, but no

negotiation, arbitration, conflict resolution, direction or management of others, or

23

group or tandem tasks) interaction with coworkers and supervisors." (Tr. 18).

In support of Motes' argument that the ALJ did not account for his difficulty with concentration, persistence, or pace, he cites *Ramirez v. Barnhart*, 372 F.3d 546, 554 (3d Cir. 2002). In <u>Ramirez</u>, the Court found that an ALJ did not adequately convey his step three finding that a claimant "often" had limitations in concentration, persistence, or pace due to a vocational expert by limiting the claimant to "no more than simple one or two-step tasks; no travel outside the workplace; and a reasonable opportunity to receive and make telephone calls." <u>Id</u>. The Court explained that the ALJ's assessment was incomplete because it did not account for a credibly established deficiency in pace. Motes also provides citations to courts within the Third Circuit that have remanded under similar circumstances where an ALJ failed to account for a credibly established limitations in concentration, persistence or pace. See *Steininger v. Barnhart*, No. 04-CV-5383, 2005 WL 2077375 at *3 (E.D. Pa. Aug. 24, 2005) (remanding because an ALJ's RFC assessment and hypothetical question that the claimant be limited to "simple, repetitive tasks," did not adequately account for a moderate limitation in concentration, persistence, or pace).

However, this case is distinguishable from <u>Ramirez</u> and similar cases cited to by Motes. Unlike <u>Ramirez</u>, the ALJ's RFC assessment (and hypothetical

question) in this case conveys a limitation in concentration, persistence, and pace: routine and repetitive tasks; a static low stress environment with infrequent changes and changes that did occur would be explained and/or demonstrated and could be learned in 30 days or less; jobs that are not fast paced or have strict production or time quotas; and limitation to incidental or no contact with the general public and only occasional, superficial interaction with coworkers and supervisors.  The ALJ's assessment accounts for far more than what Motes alleges. That is, Motes appears to argue that the ALJ's RFC assessment merely provides a limitation to low stress and simple repetitive, one-to-two step tasks, and limited contact with the public and co-workers.  However, as shown above, these were only some of the limitations accounted for by the ALJ.  Motes fails to recognize that the ALJ further accounted for his limitations in the RFC assessment by including infrequent changes to the work environment, and changes that did occur would be explained and/or demonstrated and could be learned in 30 days or less, and jobs that are not fast paced or have strict production or time quotas. Accordingly, substantial evidence supports the ALJ's RFC assessment.

## C.    Listings 12.03, 12.04, 12.06, and 9.00

Motes argues that he meets the criteria for listings 12.03, 12.04, 12.06, and 9.00.  A claimant must establish each element of a Listing to meet a Listing.  20

C.F.R. § 404.1525(d) ("To meet the requirements of a listing, you must have a medically determinable impairment(s) that satisfies all of the criteria in the listing."). As explained by the United States Court of Appeals for the Third Circuit:

> For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 110 S.Ct. 885, 891, 107 L.Ed.2d 967 (1990) (emphasis in original). "For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Id*. (emphasis in original).

*Williams v. Sullivan*, 970 F.2d 1178, 1186 (3d Cir. 1992). Thus, if there is one element that is not satisfied, the ALJ will have substantial evidence to conclude that a claimant does not meet a Listing. See *Williams*, 970 F.2d at 1186.

Listings 12.03, 12.04, and 12.06 requires that the claimant's impairment(s) satisfy both the diagnostic criteria of paragraph A of each listing, as well as the paragraph B criteria, which, for these listings, requires at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation,

each of extended duration.  20 C.F.R. pt. 404, subpt. P, app. 1, §§ 12.03, 12.04, 12.06.

Essentially, Motes' argument rests on the June 28, 2013 medical opinion of consultative examiner Dr. Schnieder, at the complete exclusion of all other medical opinions to establish the criteria for subsection B.  As explained above, substantial evidence supports the ALJ allotting little weight to Dr. Schneider's opinion that Plaintiff experienced marked and extreme psychological impairments.  Accordingly, it was not error for the ALJ to not conclude that Motes met the criteria for Listings 12.03, 12.04, and 12.06.

With regard to Listing 9.00, Motes argues that the ALJ failed to adequately evaluate his diabetes mellitus.  Under Listing 9.00, a claimant with an endocrine disorder like diabetes mellitus, must show that his endocrine disorder has caused him to meet or equal the criteria of a listing for another body system.  See 20 C.F.R. Pt. 404, Subpt. P, App 1, § 9.00(B)(5).  Here, Motes fails to direct the Court to any evidence supporting his allegation that his diabetes mellitus meets or equals the criteria of a listing for another body system.  Therefore, it was not error for the ALJ to not conclude that Motes met the criteria for Listing 9.00.

### D.      Credibility Evaluation

Motes also challenges the ALJ's credibility evaluation, stating the ALJ erred

by: (1) drawing an adverse inference from Motes' failure to comply with treatment; (2) remarking that Motes' mental conditions improved with treatment; (3) citing Motes' activities of daily living; (4) assigning limited weight to a third party function report; (5) failing to consider Medical Vocational Guideline 201.00(h)(3); and (6) failing to conduct a proper pain analysis.

The ALJ is charged with the responsibility of determining a claimant's credibility. See *Baerga v. Richardson*, 500 F.2d 309, 312 (3d Cir. 1974). The ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reason for that weight." SSR 96-7p. Ordinarily, an ALJ's credibility determination is entitled to great deference. See *Zirnsak v. Colvin*, 777 F.3d 607, 612 (3d Cir. 2014); *Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003).

The ALJ provided a detailed explanation to support his determination that Motes' allegations regarding the limiting effects of his alleged conditioners were not fully credible. (Tr. 19-21).

> The claimant's allegations of disability are inconsistent with the medical evidence ... With regard to the alleged shoulder impairment ... [s]ubsequent treatment records indicate that the claimant attended physical therapy and that he was doing "much

better." With regard to the alleged sleep apnea, the evidence indicates that this condition is being managed medically and is amenable to proper control by adherence to recommended medical management. Treatment records show that the claimant used a BiPAP machine and slept with no episodes of apnea. With regard to the alleged diabetes mellitus, medical records reflect evidence of elevated blood glucose levels, due in part to medication noncompliance. Recent treatment records indicate that the claimant['s] sugars were getting "much better". In addition, hospital records indicate that the claimant had an "incredibly well organized, well disciplined, and reliably practice" exercise routine to maintain blood glucose levels ... recent treatment records indicate that he denied any pain or loss of sensation ... While he reported feeling tired, he indicated that he could still focus and function ... Physical examinations further documented normal range of motion of the upper and lower extremities, normal motor strength of the upper and lower extremities, stability in all extremities with no pain on inspection, no numbness to the upper and lower extremities, normal sensation, intact deep tendon reflexes, normal fine motor movements, normal coordination, and normal gait and station ... The record indicates that claimant received [routine and/or conservative treatment] for the above physical impairments ... The records further indicates that such treatment has generally been successful, as recent treatment records show the claimant has been working out and weight lifting.

In terms of his alleged mental impairments ... the record indicates that [subsequent mental health treatment and status examinations] documented normal mood and affect, normal appearance/good hygiene, good eye contact, calm motor behavior, normal speech, coherent thought processes, normal thought content, normal orientation, normal immediate, recent, and remote memory, normal concentration, good attention and focus, good arithmetical skills, and normal judgment and insight ... treatment records indicate that he denied hallucinations ... Consistently, mental status examination indicated that the claimant did not appear to respond to any internal stimulus ... Recent treatment records show

that the claimant had good energy and that he denied medication side effects.

(Tr. 19-21) (internal citations to record omitted). The ALJ concluded that:

Other factors lessen the overall credibility of the claimant's allegations. Although the claimant alleges that his impairments preclude him from all work activity, his activities suggest he is not as limited as one would expect given his reported symptoms and limitations. The Claimant is able to maintain personal needs and grooming, take care of pets, prepare simple meals, and complete household chores. The record supports an ability to attend appointments, shop in stores, go to the gym, take vacations, use the computer, design t-shirts and sweatshirts, read daily, and watch television ... Treatment records indicate that the claimant['s] mental conditions were stable. Further, the claimant reported in medical records that he had good energy, stable mood, and improved attention and concentration.

(Tr. 21) (internal citations to record omitted).

Motes alleges that the ALJ improperly drew an adverse inference from Motes' failure to comply with treatment. However, the ALJ specifically provided that "[w]hile the claimant's noncompliance is not a basis for denying his claim, it is a basis for discounting the overall credibility of the subjective complains ...." (Tr. 21). Motes next argues that the ALJ failed to note that having a stable condition does not mean that the claimant is not disabled. While this is true, in the context of the credibility analysis, it is a factor to be considered in assessing credibility. See *Mullins v. Colvin*, No. C13-1887, 2014 WL 3563279 at *7 (W.D. Wash. July 18, 2014) (providing that the ALJ's finding that claimant's condition improved with

treatment to be a valid reason for assessing credibility); see <u>Parra v. Astrue</u>, 481

F.3d 742, 751 (9th Cir. 2007) ("[E]vidence of 'conservative treatment' is sufficient

to discount a claimant's testimony regarding severity of impairment"); 20 C.F.R. §

404.1529(c)(3) (effectiveness of medications is a factor the ALJ may consider in

assessing credibility).

Next, Motes argues that the ALJ wrongly assessed his activities of daily

living, stating that limited daily activities are not on any way inconsistent that he

cannot perform sustained work activities. (Doc. 10 at 27). Here, however, Motes'

reported activities go beyond doing household chores. He reported going to the

gym at least three times a week, volunteering to feed needy people in Harrisburg

one or two times a month, designing t-shirts and sweatshirts on his computer one

or two days a week up to four or five hours at a time, being a learning coach to his

home-school daughter, going to Hershey Park, and traveling to Ocean City,

Maryland for vacation. (Tr. 42-47, 70-71). Insofar as activities of daily living are

properly considered in determining credibility, 20 C.F.R. § 404.1529(c)(3), and the

ALJ cited many bases for his findings that Motes was not fully credible, Motes has

not shown that the ALJ erred on this basis.

Finally the ALJ's assessment and the medical record belies Motes' third

party function report completed by his wife, his Medical Vocational Guideline

201.00(h)(3) argument, and pain analysis argument.   In this case, the ALJ noted Motes' lack of credibility and cited many bases for his findings.  The ALJ properly concluded that his complaints were not consistently supported by medical treatment records, or by his own description of his medical and mental conditions. Given these conflicts in the evidence, the ALJ as fact-finder, was entitled to give greater weight to this other objective medical evidence, objective evidence which did not support his claims, or third party claims, of total disability.  Recognizing that the "substantial evidence" standard of review prescribed by statue is a deferential standard of review, which is met by less than a preponderance of evidence but more than a mere scintilla of proof, the Court concludes that the ALJ's decisions assessing this competing proof regarding Motes' ability to function despite his various claimed physical and mental impairments was supported by substantial evidence.

## III.   CONCLUSION

A review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence.  Accordingly, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner will be affirmed.  An appropriate order will be entered.